UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

— against —

SOFYAN SAEED,

Defendant.

16-cr-350 (ARR)

**Not for print or electronic publication**

**Opinion & Order**

ROSS, United States District Judge:

This opinion follows a *Fatico* hearing held before the court on June 6, 2019. Based on the evidence presented at the hearing, I conclude that the defendant, Sofyan Saeed, is liable for a loss amount of $38,422.28, resulting in a 4-level enhancement under U.S.S.G. § 2B1.1(b)(1)(C).

On September 11, 2017, Sofyan pled guilty to committing food stamp fraud while working as an employee at Rightway Grocery. *See* Indictment ¶¶ 8–11, 15–16, ECF No. 35; Minute Entry, Sept. 11, 2017, ECF No. 89.[1] On December 20, 2017, the Probation Department provided the court and the parties with Sofyan's Pre-Sentence Investigation Report ("PSR"). *See* PSR, ECF No. 94. The PSR calculated Sofyan's total offense level as 13, with a 10-level enhancement for a loss to the government between $150,000 and $250,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(F). *See id.* ¶¶ 27–36; *see also id.* ¶¶ 9–10 ("During the time period of [Sofyan's]

---

[1] The Supplemental Nutrition Assistance Program ("SNAP"), which is operated by the Food and Nutrition Services ("FNS"), authorizes retailers to accept SNAP benefits (formerly known as food stamps) in exchange for eligible food items. *See* PSR ¶¶ 3–5, ECF No. 94; Gov't Br. 1, ECF No. 117. "[M]ost edible items, with the exception of prepared foods, vitamins, and medicines, are eligible for purchase with SNAP benefits. Items such as beer, cigarettes, paper goods, and soaps are not eligible for purchase with SNAP benefits and it is a violation of the rules and regulations governing SNAP to allow SNAP benefits to be used to purchase ineligible items. SNAP benefits may not lawfully be exchanged for cash under any circumstances." PSR ¶ 3. SNAP fraud occurs when retailers accept SNAP benefits in exchange for cash and other ineligible items. *See id.* ¶¶ 3–5.

1

involvement, from June 5, 2012, to September 30, 2012, there was an overall loss of $160,101.52 to [the government]."). The government's investigation into Rightway Grocery lasted from June 2012 to February 2016. *See id.* ¶¶ 6–8.

On January 9, 2018, the defendant objected to the loss amount calculated by Probation. *See* Def.'s Sentencing Mem. 12–16, ECF No. 97 ("[I]t is the position of the Defendant that his loss calculation should be minimally the amount for which the undercover agents made purchases (of $303.14), but, in no event not more than $6,500."). The government responded that Probation's loss calculation was correct, based on the premises that (1) any transaction of $50 or more at Rightway was "indicative of SNAP trafficking," Gov't Sentencing Mem. 2, ECF No. 103 (citing *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)), and (2) "because the offense was jointly undertaken, all of the fraudulent SNAP transactions were in furtherance of the offense and were reasonably foreseeable to the defendant," *id.* at 2–3 (citing U.S.S.G. § 1B1.3). A *Fatico* hearing was held on June 6, 2019 to determine the proper loss amount.

## DISCUSSION

### A. Legal Standard

The purpose of a *Fatico* hearing is to "determine whether under due process the sentencing judge can properly rely on statements made by the Government—typically in the presentence report" that may increase the sentencing guidelines. *United States v. Borello*, 766 F.2d 46, 60 n.23 (2d Cir. 1985). "When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor . . . provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). "[D]isputed facts relevant to sentencing . . . need be established only by a preponderance of the evidence." *United States v.*

*Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992). Hearsay is admissible in *Fatico* hearings as long as the evidence's reliability is ensured, "through cross-examination or otherwise, by demanding certain guarantees of reliability." *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978). The burden of proof is on the Government, which must establish that the facts supporting the calculation of the defendant's offense level are "more likely than not true." *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003); *see also United States v. Scaretta*, 912 F. Supp. 48, 50 (E.D.N.Y. 1996) (citing cases).

### B. The *Fatico* Hearing

It is undisputed that between July 13, 2012 and September 4, 2012, Sofyan conducted six transactions with a confidential informant ("CI"), totaling $303.14, that were violations of SNAP. *See, e.g.*, Def.'s Br. 15, ECF No. 116 (citing PSR ¶ 9). The question presented at the *Fatico* hearing was the extent to which Sofyan can be held liable for a loss amount exceeding $303.14.

At the hearing, the government first presented the testimony of FNS Senior Program Specialist Brian Kum. *See* Fatico Tr. 10–11, ECF No. 116-2. Mr. Kum testified that between February 2015 and January 2016, Rightway's total transaction amount was $895,941.98 and its average individual transaction amount was $38.85. *See id.* at 21–23; Gov't Ex. 3500-BK-02, at 5. In contrast, similar stores in Brooklyn had an average total transaction amount of $50,956.08 and an average individual transaction amount of $11.59. *See id.* Mr. Kum also testified that in January 2016, Rightway's food stamp redemption data was nearly 20 times higher than similar stores and almost half that of a major supermarket. *See* Fatico Tr. 24–25; Gov't Ex. 3500-BK-02, at 6. Mr. Kum stated that photographs from 2008 indicate that Rightway was "a fully stocked store with required staple food items" when it applied for authorization to accept SNAP benefits.

Fatico Tr. 17:18–19; *see also* Gov't Ex. 4A–CC. In contrast, when Mr. Kum visited Rightway in February 2016, he observed that the store had "very limited stock of staple food items," "the shelves were half empty," and the staple food items "were in very deplorable condition." Fatico Tr. 17:20–24; *see also id.* at 17:24 – 25 ("They were greasy. They were dented. Boxes were torn and the[re] were a large number of expired items."); *see also* Gov't Ex. 3500-BK-02, at 7–9; Fatico Tr. 19–21.

The government then presented the testimony of Special Agent Elizabeth Greaney, who works for the United States Department of Agriculture, Office of the Inspector General ("USDA-OIG") and was the case agent on the Rightway investigation. *See* Fatico Tr. 36, 43. Ms. Greaney testified that, asssuming that any transaction over $50 at Rightway was fraudulent, ALERT data[2] reveals that Rightway conducted $1,887,203.25 in fraudulent transactions during the charged conspiracy. *See id.* at 54–56; *see also* Gov't Ex. 6B. Between 2012 and 2016, 77% of Rightway's transactions were over $50, while an average of 17% of the total transactions in similar stores exceeded $50. *See* Fatico Tr. 58–60; Gov't Ex. 7A. Between June 2012 and September 2012, 75% of Rightway's transactions were over $50, while an average of 13% of the total transactions in similar stores exceeded $50. *See* Fatico Tr. 60–62; Gov't Ex. 7B. As to her observations of Rightway itself, Ms. Greaney testified that she never saw baskets or carts at the store, and that the store contains a small counter space with a manual register. *See* Fatico Tr. 55, 78. While Ms. Greaney does not have firsthand knowledge of the condition of the store's inventory in 2012, she believes "the store looked roughly the same throughout the entire . . . undercover operation[]." *Id.* at 77:9–12.

After analyzing the evidence presented at the hearing, I find that the government has

---

[2] "[SNAP] redemption data is maintained in [a] database called ALERT that is maintained by [FNS]." Fatico Tr. 51:6–7.

demonstrated by a preponderance that SNAP transactions exceeding $50 at Rightway are indicative of fraud. In *United States v. Uddin*, the Second Circuit held that the district court's "use of $50 as a general point of reference for likely fraudulent transactions, even if not based on precise data, was reasonabl[e]" based on comparison data and witness testimony. 551 F.3d 176, 180 (2d Cir. 2009). Many of the factors that made $50 a reasonable threshold in *Uddin* are present in the instant case.

First, in *Uddin*, the court found the $50 threshold appropriate given that Uddin's store, Dhaka Grocery, "redeemed several times the value in food stamp benefits than did two comparably sized grocery stores nearby." *Uddin*, 551 F.3d. at 178. While "82% of the total food stamp benefits redeemed by Dhaka . . . involved transactions of $50 or more, . . . the average food stamp transaction in a New York City grocery store was around $12, making the activity in Uddin's small store quite unusual." *Id.* at 179; *see also id.* at 180. Similarly, Rightway's transaction amounts and redemption data surpassed similar stores, both in 2012 and throughout the investigation. In 2012, 75% of Rightway's transactions were over $50, while only 13% of transactions in similar stores were over $50. *See* Fatico Tr. 60–62; Gov't Ex. 7B. These percentages remained roughly the same over the course of the investigation. *See* Fatico Tr. 58–60; Gov't Ex. 7A. Further, in 2015 and 2016, Rightway's average transaction was over three times the average transaction at similar stores, and its redemption data was nearly 20 times greater. *See* Fatico Tr. 21–25; Gov't Ex. 3500-BK-02, at 5–6.[3]

Second, the "size" and "set up" of the store in *Uddin* made $50 a reasonable cut-off. *See Uddin*, 551 F.3d at 180; *see also id.* at 179 (noting that one of the government's *Fatico* witnesses testified that the "small size of the store" and the "lack of baskets or carts . . . would have made it

---

[3] While Mr. Kum testified only about 2015 and 2016 data, his testimony supports the government's argument that high redemptions at Rightway are indicative of fraud.

5

difficult to purchase large amounts of food"). Ms. Greaney likewise testified that it is unusual for small stores such as Rightway, which have limited counter space, a manual register, and no baskets or carts, to conduct transactions over $50. *See* Fatico Tr. 54–55.

Third, the *Uddin* court found that the limited supply of SNAP-eligible inventory and the outdated nature of such inventory made purchases over $50 in Dhaka unlikely. *See Uddin*, 551 F.3d at 179–80. Mr. Kum's photographs and credible testimony indicate that, like Dhaka, Rightway's SNAP-eligible inventory was both limited and outdated. *See* Fatico Tr. 17–21; Gov't Ex. 3500-BK-02, at 7–9. While Mr. Kum's observations took place in 2016, I credit Ms. Greaney's testimony that the store looked substantially the same throughout the investigation. Thus, I conclude that the $50 threshold used by the government to calculate Sofyan's loss amount is appropriate. *See* Fatico Tr. 77.

The government properly concluded that Sofyan should only be held liable for the loss that occurred between July 12, 2012 and September 4, 2012, the first and last dates on which the CI engaged in illegal SNAP transactions with the defendant. *See* Gov't Br. 3. Further, I agree with the government that the defendant is accountable for all fraudulent transactions that occurred during this relevant time period because, "based on []his knowledge and his own involvement in fraudulent transactions, any fraudulent transactions that took place . . . were reasonably foreseeable to the defendant." Gov't Br. 3; *see also* U.S.S.G. § 1B1.3.[4] Looking at

---

[4] The defendant argues that under *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), he should only be held liable for "the actual loss that can be chargeable to him." Def.'s Br. 3. In *Honeycutt*, the Supreme Court held that any forfeiture mandated by 21 U.S.C. § 853(a)(1), a forfeiture statute that applies to narcotics offenses, must be "limited to property the defendant himself actually acquired as the result of the crime." 137 S. Ct. at 1635. I agree with the government that *Honeycutt* does not apply because "[a]t issue, here, is the loss amount for purposes of determining the applicable United States Sentencing Guidelines" and "[t]hat loss amount determination is governed by U.S.S.G. §§ 1B1.3 and 2B1.1, which both explicitly make clear that the defendant must be held accountable for activities that were reasonably foreseeable to him." Gov't Reply 1–2, ECF No. 119. I note, however, that the government is seeking forfeiture under 18 U.S.C. § 981(a)(1)(C). *See* Indictment ¶ 17. In *United States v. Gil-Guerrero*, the government conceded that "the reasoning of *Honeycutt*—insofar as it rejects joint and several liability as a basis for forfeiture—also applies to forfeiture under 18 U.S.C. § 981(a)(1)(C)." 759 F. App'x 12, 18 (2d Cir. Dec. 21, 2018)

the relevant time period, the sum of all SNAP transactions over $50 equals $64,037.14. *See* Gov't Br. Ex. A.[5]

The government proposes a 13% reduction to this loss amount, based on the fact that "on average, 13% of the SNAP transactions at other similar store types in the same zip code as Rightway were over $50 transactions." Gov't Br. 4. The 13% reduction, however, does not adequately account for "the false assumption that 100 percent of the $50 and more purchases were fraudulent." *Uddin*, 551 F.3d at 180. Assuming the government's comparison stores do not engage in food stamp fraud, then approximately 13% of Rightway's transactions over $50 were entirely nonfraudulent. In some transactions over $50, however, SNAP recipients are inevitably using their benefits to purchase a combination of SNAP-eligible and SNAP-ineligible items. It therefore makes sense to apply an additional discount to account for these combination transactions. *See, e.g.*, *id.* (finding it reasonable for the district court to discount the total loss by 40% based on an "estimate that only 60% of the transactions of $50 or more were actually fraudulent"). I find the 40% reduction applied in *Uddin* appropriate, resulting in a total loss to the government of $38,422.28. Sentencing will take place on a date and time to be determined by the court.

SO ORDERED.

---

(summary order). The government is directed to submit a letter to the court by June 17, 2019 indicating either that the parties have come to an agreement regarding the forfeiture amount, or, if an agreement cannot be reached, the amount of forfeiture the government is seeking and the legal bases for that amount. The defendant's reply, if any, is due by June 19, 2019.

[5] The defendant claims that the government miscalculated the sum and that it actually equals $64,036.94; however, he acknowledges that this difference is *de minimus*. *See* Def.'s Reply 1–2, ECF No. 118.

                                            _____/s/_____
                                            Allyne R. Ross
                                            United States District Judge

Dated:   June 13, 2019
         Brooklyn, New York